IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
x----------------------------x
ARSALAN FAGHRI,                :
FERESHTEH AMINI, and           :
ROUDABEH FAGHRI,               :
                               :
        Plaintiffs             :    Civil Action No.  06-777-***
                               :
        v.                     :
                               :
SECRETARY MICHAEL CHERTOFF,    :
et al.,                        :
                               :
        Defendants             :
                               :
x----------------------------x
```

<u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

I. INTRODUCTORY STATEMENT

This is an action in which plaintiffs, Arsalan Faghri, Fereshteh Amini and Roudabeh Faghri (collectively, "plaintiffs") seek an order compelling defendants to expedite their applications to adjust status to lawful permanent residency. As set forth below, the case is uniquely inappropriate for judicial intervention.

By statute, adjustment of status is committed to the sound and unfettered discretion of the Secretary; neither the Immigration & Nationality Act ("the Act" or "the I.N.A."), nor

the applicable regulations specify a time frame within which an application must be adjudicated; the Act expressly removes adjustment-of-status decisions from the orbit of judicial review; and, putting the Act to one side, the discretionary nature of the process at hand renders mandamus and review under the Administrative Procedure Act ("A.P.A.") completely inappropriate.

Not surprisingly, therefore, a host of cases have dismissed suits such as the instant action for lack of jurisdiction. Accordingly, for the reasons explained more fully below, the Government respectfully asks that this motion to dismiss be granted.

II. PLAINTIFFS' ALLEGATIONS

Plaintiffs' allegations are straightforward. Arsalan Faghri, the primary applicant, along with Fereshteh Amini, his wife, and Roudabeh Faghri, his daughter, both derivative applicants, allege that on or about July 14, 2003, they filed a Petition for Alien Worker, Form I-140, which was ultimately approved on June 29, 2004. P 18. Simultaneously, plaintiffs filed an I-485 application to adjust status and become permanent residents of the United States. Ps 6-8; Attachment A. Receipt of the I-485 application was acknowledged by the U.S. Citizenship and Immigration Services ("Service") on July 30, 2003. At the request of the Service, on September 28, 2004, the plaintiffs

2

supplemented their applications by supplying fingerprints. P 20.

Plaintiffs allege that notwithstanding their repeated inquiries the Service has not acted on their applications.[1]  P 21.  Plaintiffs acknowledge, however, albeit on information and belief, that the F.B.I. has not provided the immigration service with the results of the background and/or name check relating to their applications.  Id., Ps 22, 24.

Based on the foregoing, plaintiffs appear to advance three substantive causes of action.  First, they seek relief under the A.P.A., principally 5 U.S.C. Section 706(1), which provides that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed".  P 30.  Second, plaintiffs petition the Court to issue a writ of mandamus pursuant to 28 U.S.C. Section 1361, compelling defendants to adjudicate their applications.  P 4.  Third, plaintiffs seek relief under the Declaratory Judgment Act, 28 U.S.C. Section 2201.  P 13.

For the reasons set forth below in greater detail, the Government respectfully suggests that the Court lacks subject

---

1  On or about February 15, 2006, plaintiff, Arsalan Faghri, also filed a request for information under the Freedom of Information Privacy Act.

matter jurisdiction to grant relief under either statutory framework.

### III. THIS MOTION TO DISMISS SHOULD BE GRANTED

#### A. The Immigration & Nationality Act

In order to put the plaintiffs' allegations in context, it is necessary to first examine the adjustment-of-status statute, Section 245(a) of the I.N.A., 8 U.S.C. §1255(a). This provides, in terms, that the status of an alien who has been admitted or paroled into the United States "<u>may</u> be adjusted by the [Secretary], <u>in his discretion</u> and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence . . . ." (emphasis added). Granting or denying the application is thus discretionary. Significantly, neither the face of the statute nor the enabling regulations specify a time frame within which the Secretary must act on the application. <u>Id.</u>; 8 C.F.R. Section 245. <u>Grinberg v. Swacina</u>, No. 06-22593, 2007 WL 840109, at *1 (S.D.Fla. Mar. 20, 2007)(If Congress intended to confer jurisdiction on a federal court to review the pace of adjudication for adjustment of status applications, it would have expressly provided for a time limitation in 8 U.S.C. Section 1255(a), as it did in 8 U.S.C. Section 1447(b). Section 1447(b) provides for a 120 day time

limit to make a determination on a naturalization application after an examination is conducted.  8 U.S.C. Section 1447(b) (2006).  That Congress did not do so here reflects its intent to leave the pace of adjudication discretionary with the United States Attorney General and outside the scope of judicial review. While this Court acknowledges Plaintiff's frustration from waiting indefinitely in "immigration limbo" for a determination, it finds that Congress, rather than a federal court, is the proper governmental body to fashion a remedy.").

Further evidence that the process is quintessentially discretionary, and is removed from the ambit of judicial review is provided by two subsections of 8 U.S.C. Section 1252:

(a) First, Section 1252(a)(2)(B)(i) provides that, notwithstanding any other provision of law, including the mandamus statutes, 28 U.S.C. Sections 1361 and 1651, "no court shall have jurisdiction to review any judgment regarding the granting of relief under section . . . 1255 of this title, . . . ."[2]  In addition, Section 1252(a)(2)(B)(ii) expressly precludes judicial review of "any other decision or action of the . . . Secretary of Homeland Security the authority of which is

---

[2] As amended by the REAL ID Act of 2005, H.R. 1268, 109th Cong. (2005)(enacted), Pub. L. No. 109-13, Div. B, 119 Stat. 231 ("the R.I.D.A.").

specified under this subchapter to be <u>in the discretion</u> of the .
. . Secretary of Homeland Security . . . ." (emphasis added). <u>See</u>
<u>e.g.,</u> <u>Safadi v. Howard</u>, 466 F.Supp.2d 696 (E.D. Va. 2006)
(discussing Section 1252(a)(2)(B) and granting motion to
dismiss); <u>Sharkey v. Ganter</u>, No. 05 Civ. 5577(PAC), 2006 WL
177156, at *2-4 (S.D.N.Y. Jan. 24, 2006) (same).

      (b) Second, Section 1252(g) of Title 8 states that
except as otherwise provided in that section, and again
notwithstanding any other provision of law, including the
mandamus statutes, 28 U.S.C. Sections 1361 and 1651, "no court
shall have jurisdiction to hear any cause or claim by or on
behalf of any alien arising from the decision by the Attorney
General to commence proceedings, adjudicate cases, or execute
removal orders against any aliens."[3]  In this regard, the case of
<u>Gomez-Chavez v. Perryman</u>, 308 F.3d 796 (7th Cir. 2002) is
directly on point.

      There, the alien filed an I-130 petition for alien
relative, an I-485 petition to adjust status, and an I-212
petition for leave to re-apply for admission after removal, <u>i.e.</u>,
a waiver of inadmissibility.  He also commenced an action for a
declaratory judgment and a writ of mandamus, asserting that the

---

[3] As amended by the R.I.D.A.

Service had improperly refused to adjudicate his I-212.

The Court of Appeals for the Seventh Circuit ruled, however, that petitioner's arguments "fit[] squarely within the steps covered by the prohibition on judicial review" set forth in Section 242(g) of the statute:

> Under § 1252(g), courts are barred from reviewing discretionary decisions to commence proceedings, adjudicate cases, or execute removal orders.

308 F.3d at 800, citing Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999).

The Court of Appeals noted further that these "strict limitations" apply not only to affirmative actions, but to refusals to act as well.  Thus, an alien attempting to seek judicial review of such "discretionary measures" cannot evade the bar of Section 242 "by the simple expedient of recharacterizing a claim as one challenging a refusal to act."  308 F.3d at 800. See, e.g., Castillo v. Ridge, 445 F.3d 1057 (8th Cir. 2006) (mandamus not available to compel action on request for Section 1182(h) waiver of inadmissibility); Li v. Agagan, No. 04-40705, 2006 WL 637903, at *3-4 (8th Cir. Mar. 14, 2006)(citing Section 1252(g), court denied petition for writ of mandamus to compel adjudication of adjustment of status application); Kailash v. Chertoff, No.05-5494, 2006 WL 938523, at *1 (E.D. Pa. Apr. 10,

2006) (<u>citing</u> Section 1252(g), court declined to entertain cause of action for relief from denial of waiver of inadmissibility as predicate to adjustment of status), <u>appeal pending</u> (Third Circuit, No. 06-2373).

B. Mandamus and Administrative Procedure Act

Nonetheless, plaintiff invokes the jurisdiction of the Court on the alleged bases of the mandamus statute, 28 U.S.C. Section 1361, and the Administrative Procedure Act ("A.P.A."). The Government respectfully submits that the decision of the Supreme Court of the United States in <u>Norton v. So. Utah Wilderness Alliance</u>, 542 U.S. 55 (2004), disposes of both prongs of this jurisdictional allegation.

There, the Court addressed, <u>inter alia</u>, the language in 5 U.S.C. Section 706(1) that a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed," 542 U.S. at 62. The Court noted, with emphasis, that "the only agency action that can be compelled under the APA is action legally <u>required</u>. This limitation appears in §706(1)'s authorization for courts to 'compel agency action <u>unlawfully withheld</u>'" 542 U.S. at 63 (emphasis original).

Further, the Court reasoned that the A.P.A. simply extended the traditional practice, prior to its passage, of achieving judicial review through a writ of mandamus and that the

mandamus remedy was normally confined to enforcement of "'a specific, unequivocal command,'" id., quoting ICC v. New York, N.H. & H.R. Co., 287 U.S. 178, 204 (1932) and citing Kendall v. United States ex rel. Stokes, 12 Pet. 524, 613 (1838)("precise, definite act . . . about which [an official] had no discretion whatsoever"); Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council, Inc., 435 U.S. 519, 546 (1978)(§706[1] empowers a court only to compel an agency "to perform a ministerial or non-discretionary act").

The Court added that Section 706(1) also speaks of agency action which is "unreasonably delayed," 542 U.S. at 63 n.1, the essential allegation here. However, "a delay cannot be unreasonable with respect to action that is not required," id. Thus, a claim under Section 706(1) can go forward only "where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take," id. at 64 (emphasis original). Nor, under the Court's rationale, could a writ of mandamus issue, absent such required agency action. In short, the A.P.A. analysis and the mandamus analysis are one and the same.

Norton is directly on point. Adjudication of an adjustment-of-status application is a manifestly discretionary task; neither the statute nor the applicable regulations specify

9

a time frame with which the adjudication should take place; there is no "discrete agency action which it is required to take," 542 U.S. at 64; there is no action which has been "unlawfully withheld;" nor, therefore, can it be said that the agency's action has been "unreasonably delayed," 542 U.S. at 63 n.1.

Thus, it is not surprising that there is a significant body of authority, rejecting efforts, such as those of the plaintiffs here, to invoke the jurisdiction of the district courts.  These cases repeatedly reason that mandamus is inapplicable, precisely because of the discretionary nature of the process at issue, and that A.P.A. review is similarly inappropriate, <u>inter alia</u>, because the I.N.A. "preclude[s] judicial review," 5 U.S.C. Section 701(a)(1), and because the A.P.A. expressly exempts "agency action . . . <u>committed to agency discretion by law</u>," 5 U.S.C. Section 701(a)(2)(emphasis added). <u>See</u>, <u>e.g.</u>, <u>Castillo v. Ridge</u>, 445 F.3d 1057 (8th Cir. 2006) (mandamus inappropriate); <u>Li v. Agagan</u>, 2006 WL 637903 (8th Cir.)(non-precedential)(same); <u>Safadi v. Howard</u>, 466 F.Supp.2d 696 (E.D. Va. 2006)(rejecting mandamus and A.P.A. allegations, <u>citing</u>, <u>inter alia</u>, 5 U.S.C. Section 701[a][2]); <u>Keane v. Chertoff</u>, 419 F.Supp.2d 597 (S.D.N.Y. 2006) (same, <u>citing</u>, <u>inter alia</u>, 5 U.S.C. Section 701[a][2]); <u>Sharkey v. Ganter</u>, 2006 WL 177156 (S.D.N.Y.)(neither mandamus nor A.P.A. applicable, <u>citing</u>,

inter alia, 5 U.S.C. Section 701[a][2]); Mustafa v. Pasquerell,
2006 WL 488399 (W.D. Tex.)(rejecting mandamus and A.P.A.
allegations and citing Norton v. So. Utah); Karan v. McElroy,
2003 WL 21209769 (S.D.N.Y.)(rejecting mandamus and A.P.A.
allegations); Zheng v. Reno, 166 F.Supp.2d 875, 879-880 (S.D.N.Y.
2001)(judicial creation of duty to act on adjustment-of-status
application within specified time frame, where none is prescribed
by statute, "'would have potential for mischievous interference
with the functioning of already overburdened administrative
agencies,'", quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182
[2d Cir. 1978]); Rahman v. McElroy,  884 F.Supp. 782 (S.D.N.Y.
1995)(mandamus does not lie to require immigration service to
schedule adjustment-of-status interviews at specific time or in
specific sequence). Cf. Dridi v. Chertoff, 412 F.Supp.2d 465
(E.D. Pa. 2005) (action to compel adjudication of I-129F petition
for alien fiancée -- held, mandamus inappropriate absent
specified time for adjudicating petition).  But see, e.g.,
Salehian v. Novak, 2006 WL 3041109 (D. Conn.) (exercising
mandamus jurisdiction to compel adjudication of adjustment-of-
status application, citing cases, without, however, citing

11

Norton); <u>Kim v. Ashcroft</u>, 340 F.Supp.2d 384 (S.D.N.Y. 2004)(same, also not citing <u>Norton</u>).[4]

The restraint exercised by the majority of the above cases is entirely appropriate, for reasons articulated in the recent decision in <u>Manzoor v. Chertoff</u>, 2007 WL 413227 (E.D. Va. 2007), a closely analogous, naturalization case.  We emphasize that naturalization and adjustment of status are very different processes and that they implicate entirely different statutory frameworks.  Nonetheless, <u>Manzoor</u>'s cogent and thoughtful observations about judicial intervention in the application process pertain here as well and with equal force.

First, <u>Manzoor</u> observes that the courts are ill-equipped to conduct background checks of naturalization applicants.  In some cases, follow-up inquiry by the F.B.I. may be necessary, and once this process is competed, evaluation of the data assembled by the F.B.I., as well as any follow-up questioning of the applicant, are best left to the USCIS.

_____

[4] <u>Accord</u>, <u>Paunescu v. INS</u>, 76 F.Supp.2d 896 (N.D. Ill. 1999) and <u>Agbemaple v. INS</u>, 1998 WL 292441 (N.D. Ill.).  In the wake of the Seventh Circuit's analysis in <u>Gomez-Chavez</u>, <u>supra</u>, p.5, 308 F.3d at 796, however, the precedential value of North District of Illinois decisions in <u>Paunescu</u> and <u>Agbemaple</u> is questionable.

Manzoor, 2007 WL 413227 at *7.  The same can readily be said of adjustment-of-status applicants.

Moreover, Manzoor quite frankly, and we believe appropriately, notes that it has no desire to provide any incentive to applicants to commence litigation as a device for expediting the naturalization process.  Id. At *7.  It adds that the lawsuits such as the one before it (and the same is true of the instant action) "divert CIS's attention and resources away from the adjudication of naturalization applications."  Id.

Thus, Manzoor concludes that it "has no desire to make the filing of a lawsuit a means for a naturalization applicant to 'jump to the front of the line,'" Id.  Such a result, while obviously addressing whatever injustice the plaintiff may have endured, only creates another injustice in its place, by forcing the applicant who did not file a lawsuit to wait even longer, while the litigation plaintiffs receive priority to which they have no intrinsic entitlement.  Again, there is absolutely no principled basis on which to distinguish between the naturalization applicant before the court in Manzoor and the adjustment-of-status applicant here.

Ultimately, the real underlying issue boils down to one of resources.  As Manzoor notes, in fiscal year 2006, the F.B.I. processed more than 3.4 million name checks. 2007 WL 413227 at

*2. With an increase in support, the F.B.I. could undoubtedly do better, but this is a budgetary issue which needs to be addressed at the legislative and executive levels, and not, we respectfully submit, by the judiciary. See, e.g., Mustafa, supra, 2006 WL 488399 ("'delays of this nature are inevitable and becoming more frequent in light of heightened security concerns in the post-911 world,'" quoting Alkenani v. Barrows, 356 F.Supp.2d 652, 657 [N.D. Tex. 2005]).

This is precisely the point with which the court concluded its opinion in Safadi:

> It is worth noting that plaintiff's frustration over the pace of the adjudication process is better addressed to the political branches which, as the Supreme Court has noted, have "the responsibility for regulating the relationship between the United States and our alien visitors."

2006 WL 3780417 at *4 n.7, quoting Mathews v. Diaz, 426 U.S. 67, 81 (1976).

C. The Declaratory Judgment Act

The Declaratory Judgment Act, 28 U.S.C. Section 2201, also does not provide an independent basis for subject matter jurisdiction. See, e.g., Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 351 (3d Cir. 1986); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-672 (1950) (holding that the

Declaratory Judgment Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction"); see also Chaudry v. Chertoff, No. 06-1303 (PAM/JSM), 2006 WL 2670051, at *3 (D.Minn. Sept. 18, 2006) (dismissing complaint and holding that the Declaratory Judgment Act did not provide jurisdiction over complaint seeking a writ of mandamus to compel the USCIS to process the plaintiff's I-485 petition).

CONCLUSION

For the foregoing reasons, the Government respectfully requests that this motion be granted.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney


ELLEN W. SLIGHTS
Assistant United States Attorney

# Attachment A

1

2
UNITED STATES DISTRICT COURT

3
DISTRICT OF DELAWARE

4

5
                            )   Case No.  06-777

6
Arsalan Faghri, Fereshteh Amini,       )
and Roudabeh Faghri                )

7
                            )
           Plaintiffs,        )   Declaration of Bradley J. Brouillette

8
        vs.                   )

9
Michael Chertoff, as Secretary of the  )
Department of Homeland Security; Emilio T. )

10
Gonzalez, Director of U.S. Citizenship and  )
Immigration Services; Paul  Novak, Director,

11
Vermont Service Center, U.S. Citizenship and
Immigration Services; and Robert S. Mueller,

12
Director of Federal Bureau of Investigation,

13

14
<u>               Defendants            </u>

15
I, BRADLEY J. BROUILLETTE declare as follows:

16
1.      I am employed by the United States Citizenship and Immigration Services (hereinafter

17
"USCIS") as a Supervisory Center Adjudications Officer at the Vermont Service Center

18
(hereinafter "VSC"), in St. Albans, Vermont.  I have held this position since December

19
12, 2003.  I have been employed by the agency in various capacities since November

20
1995.  I make this declaration based on my personal knowledge and my review of official

21

22
documents and records maintained by the USCIS.  If called to testify, I could and would

23
do so competently.

24
2.      This declaration is submitted in support of Defendants' motion to dismiss in the case of

25
Arsalan Faghri, Fereshteh Amini, and Roudabeh Faghri v. Michael Chertoff, et al. 06-

26
777, now pending before the United States District Court for the District of Delaware.  It

27

1

1    provides a factual summary of the agency's adjudication policy as well as a review of the

2    plaintiff's file.

3.   When a visa petition or other application seeking an immigration benefit on behalf of an

4    alien is filed with USCIS, the agency conducts numerous mandatory criminal and

5    national security background checks.  These checks are conducted both to enhance

6    national security and ensure the integrity of the immigration process.  These security and

7    background checks serve to screen out aliens who may seek to harm the United States

8    and its citizens or who may be seeking immigration benefits improperly or fraudulently.

9    These security checks have yielded information about applicants involved in violent

10   crimes, sex crimes, crimes against children, drug trafficking and individuals with known

11   links to terrorism.  Pursuant to established agency policy, all required security checks

12   must be completed prior to adjudication of the application.

4.   The attached Fact Sheet explains the different types of checks that must be completed.

     (See Fact Sheet, dated April 25, 2006, a true and correct copy of which is attached

     hereto as Exhibit 1).  The checks include the FBI Name Check, FBI fingerprint check,

     and the DHS-managed Interagency Border Inspection System (IBIS).  The records

     maintained in the FBI name check process consist of administrative, applicant, criminal,

     personnel and other files compiled by law enforcement agencies.  Although in the

     majority of FBI name checks no matches are found, some cases involve complex or

     highly sensitive information and cannot be resolved quickly.  The IBIS system contains

     records and information from more than 20 federal law enforcement and intelligence

     agencies including the Central Intelligence Agency (CIA), FBI and other divisions of the

     U.S. Department of Justice, the Department of State, DHS Customs and Border

     Protection (CBP) and other DHS agencies.  It is a multi-agency effort with a central

     system that combines information from these various sources and databases to compile

     information regarding national security risks, public safety concerns, and other law

     enforcement concerns.  IBIS provides, but is not limited to, information related to

2

persons who are wanted criminals, persons of interest in the context of national security, and other derogatory information, including adverse immigration history. While the results of an IBIS query are usually available immediately, in some cases information found will require further investigation. Finally, FBI fingerprint checks provide information relating to criminal background within the United States. Results are usually received within days and while the vast majority results in no criminal record, positive results may have a direct bearing on the eligibility of an applicant for the immigration benefit being sought.

5.     Once USCIS receives an I-485 a file is opened and an electronic record of that application is created. Much of this initial electronic processing and data entry is automated, including the automatic generation and electronic transmission of a FBI name check request in FBIQUERY, the FBI repository and tracking system for FBI Name Check requests. Once the initial file creation and processing of an I-485 application is complete, each file is placed on an I-485 pending shelf for processing and adjudication in chronological order according to date of receipt.

6.     Due to bi-specialization, the VSC no longer accepts any new I-485 applications. All pending cases being held for FBI name and date of birth check clearance and Visa Availability have been sent to the Texas Service Center. The VSC has retained approximately 15,000 pending cases in which the adjudicative process had already begun and the adjudication of those cases will be completed at the VSC.

7.     VSC periodically runs an electronic report in FBIQUERY system for all files on the I-485 pending shelf to confirm the successful transmission of the FBI Name Check request and to identify those applications that have received responses from the FBI name checks and FD-258 (fingerprints) and are thus ready for adjudication. FBI name check requests that have been received by the FBI but have not yet been completed are indicated by a

3

1 notation of "Pending" in FBIQUERY. An FBI Name Check that has been completed will

2 be indicated by various entries depending on the result, including No Record, Positive

3 Response, etc.

4 8. This report will also identify those I-485 applications that have received a "No Data" or

5 "Error" response in FBIQUERY indicating a problem with transmission of the name

6 check request from USCIS to the FBI. If such a problem is reported, the FBI name check

7 requests will then be initiated a second time and resent manually or electronically to the

8 FBI for a response. In this way USCIS ensures that the FBI has in fact received all

9 requests for name checks.

10 9. All files on the FBI Name Check Shelf are audited regularly in order to identify those in

11 which a response from the FBI has been received. This audit is conducted at least every

12 three weeks or more often. In this manner the agency ensures that as FBI responses are

13 received, files are expeditiously released for adjudication. FBIQUERY reports do not

14 provide USCIS with any indication as to what information the FBI may have relating to a

15 particular alien, whether an FBI investigation into the particular alien has been

16 undertaken, or whether there are national security concerns relating to that alien.

17 10. For most applicants, USCIS can quickly determine if there are criminal or security

18 related issues in the applicant's background that affect eligibility for immigration

19 benefits. However, due both to the sheer volume of security checks USCIS conducts,

20 and the fact that USCIS must await responses from the FBI or other relevant agencies

21 that conduct some of the required security checks, some delays on individual

22 applications are unavoidable and may be lengthy. Moreover, in some cases a

23 background or security check will reveal that positive (derogatory) information on the

24 subject alien is possessed by some agency other than USCIS without necessarily

25 revealing the substance of that information. In such cases, USCIS works closely with

4

1    the other law enforcement or intelligence agencies to obtain all available information

2    concerning the positive result in order to properly evaluate its significance. Even where

3    the FBI or a third agency has provided a final response, a case may still be considered

4    pending where the response requires further investigation or review by USCIS or

5    another agency.   It is vitally important to thoroughly screen each applicant in order to

6    resolve all concerns of a law enforcement or national security nature before determining

7    that an individual is eligible for an immigration benefit.

8    11.    The agency's policy for requesting expedited security checks requires that the applicant

9    meet one of the following criteria:

10             1.   Military Deployment.

11

12             2.   Age-out cases not covered by the Child Status Protection Act and applications

13                  affected by sunset provisions such as the Diversity Visa Program.

14             3.   Compelling reasons provided by the requesting office such as critical medical

15                  conditions.

16             4.   Loss of Social Security benefits or other subsistence at the discretion of the

17                  Director.

18    U.S. Citizenship and Immigration Services (USCIS) is no longer routinely requesting the

19    FBI to expedite a name check when the only reason for the request is that a mandamus

20    (or other federal court petition) is filed in the case.

21

22    12.    USCIS reports the average processing times for specific applications and petitions on the

23    USCIS website.  This information reflects only average processing times on the date the

24    information is published.  Average processing times fluctuate widely and will sometimes

25    even regress for a specific form type due to a number of factors, including a reallocation

26    of agency resources, reordering of the agency's priorities, and other reasons.

27

5

1    Additionally, not every application will require the same level of inquiry.  Some may

2    require a more detailed level of review and or investigation from either the USCIS or

3    other agencies for a number of reasons ranging from the alien's eligibility for the benefit

4    sought to national security concerns.  Accordingly, even when it appears that the

5    adjudication of a particular application is outside the average processing time, this does

6    not establish that the delay is unreasonable or even due to factors within the control of

7    USCIS.

8

9   13.   The FBI has an established process of processing FBI Name Check requests from USCIS

10        chronologically based on the date the request is forwarded.  As stated above, certain

11        requests can be expedited if they meet specific expedite criteria.  However, it is important

12        to note that whenever a particular application or petition receives expedited processing

13        and is moved up in the queue, it is at the expense of those still unadjudicated petitions or

14        applications that bear an earlier filing date.  There is no statutory or regulatory time limit

15        for the adjudication of I-485s.  Moreover, an alien who has applied for adjustment of

16        status may apply for and obtain employment authorization for the entire time his or her

17        application is pending. Most applicants for adjustment of status may also apply for and

18        obtain advance parole to enable them to travel abroad during the pendency of their

19        application.  Thus, applicants for adjustment of status are not as adversely affected by

20        delays in the adjudication of their applications as are aliens filing for other immigration

21        benefits.

22

23

24   14.   In my capacity as a Supervisory Center Adjudications Officer at the VSC, I have access

25        to the official files and records of the USCIS.  I have reviewed the system records for

26        plaintiff FAGHRI, Arsalan, A97 483 335; AMINI, Fereshteh, A97 483 336; and

27

6

1  FAGHRI, Roudabeh, A97 483 337.  The record reflects that on July 14, 2003, plaintiffs

2  filed applications for adjustment of status to permanent resident on Form I-485.  To date,

3  plaintiff's application remains pending the completion of security checks.  Once the

4

5  required security checks are completed, the plaintiffs' applications will be adjudicated.

6  15.    Because the plaintiffs' case does not meet one of the above-mentioned expedite criteria,

7  the agency is unable to request an expedite of the security check clearance on his behalf.

8  For this reason the USCIS cannot adjudicate plaintiffs' I-485 applications for adjustment

9  of status until such time as all security checks are complete.

10

11  I declare under penalty of perjury that the foregoing is true and correct.  Executed this

12  5th day of April, 2007 at St. Albans, Vermont.

13

14

15

16

17  Bradley J. Brouillette
   Supervisory Center Adjudications Officer
   Vermont Service Center

18

19

20

21

22

23

24

25

26

27

7



Press Office
U.S. Department of Homeland Security

# Fact Sheet

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

## How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ARSALAN FAGHRI,<br>FERESHTEH AMINI and<br>ROUDABEH FAGHRI, | : <br> : <br> : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :    Civil Action No. 06-777-*** |
| | : |
| SECRETARY MICHAEL CHERTOFF, et al., | : |
| | : |
| Defendants. | : |

### AFFIDAVIT OF SERVICE

I, Kathie Gray, an employee in the Office of the United States Attorney for the District of Delaware, hereby attest under penalty of perjury that on April 13, 2007, I electronically filed the foregoing **MOTION OF DEFENDANTS TO DISMISS, MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, and PROPOSED ORDER** with the Clerk of Court using ECF, and I hereby attest that I have delivered two copies of said documents via United States Mail, postage prepaid, to the following:

Cynthia L. Carroll, Esquire
260 Chapman Road
Suite 201-D
Newark, DE 19702

Ann Massey Badmus, Esquire
Badmus Immigration Law Firm P.C.
12700 Park Central Drive
Suite 1910
Dallas, TX 75251

*/s/ Kathie Gray*

Kathie Gray
Office of the United States Attorney
The Nemours Building
1007 Orange Street
P.O. Box 2046
Wilmington, DE 19899